PEOPLE ex rel. FROST v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, Second Department. May 31, 1901.)

1. RAILROADS—RIGHT OF WAY—CONDEMNATIONS—CULVERTS—REMOVAL.

Laws 1846, c. 216, § 15, declares that whenever it shall be necessary for the defendant company to construct a track so as to cut off any wharf, the company shall extend the same so as to restore its former usefulness; and section 16 authorizes the owner of the land to cross the railroad at convenient places for the purpose of managing his lands. Relator owned land through which the defendant company condemned a right of way in 1848, on which it built an embankment for its track. On the east side of the embankment relator owned several brickyards; and on the west, wharves for loading brick. The embankment, as constructed, contained six culverts through it for relator's use, which were maintained until 1900, when the company removed four of them. *Held*, that the fact that the relator had temporarily suspended the use of two of the yards, and the opinion of the defendant's engineer that one culvert was sufficient for relator's present use, and that the openings were a serious danger to the traveling public, did not justify the removal of the culverts, since it did not relieve the defendant from complying with the statutory regulation, and the right to close them could be secured by purchase or condemnation.

2. SAME—MANDAMUS—PLAINTIFF—ATTORNEY GENERAL.

Laws 1846, c. 216, § 15, provides that, whenever it shall be necessary to construct a railroad across land, the company shall construct such bridges as may be necessary to reach any wharf or dock cut off by the railroad. The defendant company condemned a strip of land through relator's property, on which it built an embankment for a track, and left six openings in the embankment for relator's use; and, after maintaining them for 50 years, defendant closed four of them. *Held*, that mandamus to compel defendant to maintain six openings need not be brought by the attorney general, but may be maintained by relator, since it was an action to enforce a plain statutory duty.

3. SAME—ADEQUATE REMEDY AT LAW.

Where a railway company condemned a right of way through relator's land, and, after maintaining six culverts for relator's use for 50 years, closed four of them, the remedy at law was inadequate, and hence relator was entitled to maintain mandamus to compel a restoration of the culverts.

Appeal from special term, Kings county.

Mandamus by the people, on relation of Elihu B. Frost, against the New York Central & Hudson River Railroad Company. From an order granting the writ, defendant appeals. Affirmed.

Argued before GOODRICH, P. J., and WOODWARD, HIRSCHBERG, JENKS, and SEWELL, JJ.

George H. Walker, for appellant.

Ralph E. Prime, for respondent.

JENKS, J. The relator shows that he owns lands situate on either side of the tracks of the railroad corporation. His land on the west has frontage of wharves, piers, bulkheads, and docks on the Hudson river. Before and in 1848 the lands were used as a brickyard, and this use has continued. The railroad corporation, the predecessor of the present corporation (chapter 917, Laws 1869), incorporated under chapter 216, Laws 1846, condemned a strip of

this land, and built thereon an embankment for its tracks, and so divided the land.    Section 14 of said statute provides:

"Whenever it shall be necessary for the construction of their single, double or treble railroad or way, to intersect or cross any streams of water or water courses, or any road or highway, between the places prescribed by the first section of this act, it shall be lawful for the said corporation to construct their way or ways across or upon the same; but the corporation shall restore the stream, or water course, or road or highway, thus intersected, to its former state in a sufficient manner so as not to have impaired its usefulness."

Section 15 of the same statute provides:

" * * * They are also required to construct such bridges as may be necessary to provide for the free passage of such vessels and boats as heretofore have or now can pass into and from the same, the bays that may be crossed by said railroad, and if any wharf or dock shall be cut off by the said railroad, the said company shall extend or so improve the same as to restore it to its former usefulness, so far as it may be practicable to do so.    And the owner or the owners thereof are hereby authorized to occupy the river front, outside of said railroad, for the erection and use of wharves or docks."

Section 16 of the same statute provides:

"It shall be lawful for the owner of the land over which such railroad shall be constructed, to cross the said railroad at some convenient place or places, with his or their servants, cattle, teams and carriages, for the purpose of using and managing their respective farms, over which the said railroad shall pass, doing no injury or damage to said railroad.    In all cases where such railroad shall intersect the lands of any individual, or pass between such lands and the usual place of access to the river, and cannot conveniently be crossed by reason of high embankments, deep cuts or otherwise, the said corporation shall at their own expense construct and sustain convenient passes or roads across or under the railroad, for the passage of persons, cattle, carriages or teams, for the purposes of farming or managing such lands, and giving to them their usual access to the river."

The embankment was solid, and stood ten feet above the land on either side.    When it was built, the corporation pierced it with six culverts, all of which were used for many years, and were maintained until 1900 by the corporation, when it filled up four of them, and narrowed the remaining two by two feet each.    The land east of the embankment is divided into three brickyards, each brickyard having its separate machines, space, and limekilns.    In 1888 brickyard No. 1 was leased to persons who made brick thereon for about four years, and who used the culverts for transportation.    In 1889 the other yards were leased to persons who for the same time did likewise.    In 1894 yard No. 1 was leased to a third person, who did likewise until 1900.    But the facts must be determined by the opposing affidavits.    People v. City of Brooklyn, 149 N. Y. 215, 43 N. E. 554.    These affidavits are made by a civil engineer and a superintendent of the railroad.    The engineer deposes that he knows the premises, and then "further says that he is informed and believes" certain matters, which, as thus stated, are of no avail against positive, sworn statements of facts in the relator's case.    People v. Bricklayers' Benevolent & Protective Union, 20 App. Div. 8, 11, 46 N. Y. Supp. 648; People v. Common Council, City of Brooklyn, 77 N. Y. 503, 511, 33 Am. Rep. 659.    The affidavit does depose that since 1899 all the buildings and sheds upon the premises used for the manufacture of bricks have been removed, except a two-story brick

building erected for a power house by the Croton Brick Company, and now occupied by a tenant, who uses the same for the purpose of grinding emery, and that the furnace used for the experiment of making enameled brick is now in ruins; that the trestlework used by the said brick company upon which cars were moved from the river through a culvert to the premises of the relator, on the easterly side of the railroad, is also in ruins; that the only one of the six culverts mentioned in the moving papers used by the present sole occupant of said premises is culvert C4, which is about 26 feet in width and at least 8 feet in the clear. He further deposes that the piers and bulkheads on the westerly side of the said railroad and opposite the premises of the relator are in a state of ruin; that the clay bank upon the premises, from which material must be taken for the manufacture of brick, is at present about 1,500 feet east of the railroad tracks. In addition to the statements on information and belief, there are certain statements which are at best opinionative, and which can be regarded as facts only on the theory that they are properly the subject of expert testimony, namely, that it is impracticable, because of the location of the works used in grinding emery, to use any culvert but C4; that the state of ruin in the wharves and bulkheads is so great as to make them impracticable for loading vessels; that all kilns and dry yards necessary for the manufacture of bricks would necessarily be erected at such a distance east of the railroad tracks that all tracks necessary for the conveyance of fuel from the docks, and of burned brick to the docks, would be laid in converging lines to one culvert, and no more than one culvert would be necessary for the operation and management of any brick yards on the premises; that, from his examination of the clay beds, his opinion is that no excavation has been made therefrom for eight years, and that any break in the continuity of an earth-supported track, on which rapidly-moving trains are run, is a serious danger to the safety of the traveling public; and that therefore the culverts should be eliminated. The affidavit of the superintendent shows that the culverts are crossed by the main line, over which at least 200 trains pass daily.

It nowhere appears that the present construction of the embankment either restores the water courses, so as not to have impaired their usefulness, or leaves the usual access to the river. It does appear that such construction radically departs from that originally made, and maintained for more than 50 years, and which presumably was in uniformity with the requirements of the statute. The railroad corporation seems to stand upon these propositions: That it obeys the statute when it affords such access as is commensurate with the present actual use of the lands; that it obeys the statute so long as, in the opinion of its engineers, the use of this land for brickyard purposes requires but one culvert. The vice of these propositions is that the statute requires that the water courses must be restored to their former state in a sufficient manner so as not to have impaired their usefulness, and that in such a case as this the corporation must construct and maintain convenient passes under the railroad for the purpose of farming or managing such lands,

and giving to them their usual access to the river. The usefulness of the water course and the usual access plainly refer to the physical condition of the lands and waters at the time prior to the construction of the road, and the purpose of the statute was to leave such rights unimpaired. The land and the waters are still unchanged, and, so far as it appears, they may presently be put to the same full use that marked them for almost 50 years. The mere fact that the owner of the lands does not for a time use them so as to require at that time all of the water courses or means of usual access certainly confers no right upon this railroad to nullify the very provisions of the statute that limit its right to pass over these lands, and to condemn such part of them as may be necessary for its road. Temporary nonuser cannot work a repeal of the statutory obligations of the corporation. The very statute which gave existence and power to this corporation limited its rights to the preservation of those of the relator. Peckham v. Railroad. Co., 20 N. Y. Supp. 39. The proposition of the defendant would not only assume a right withheld from it by the statute, but would impair a right which that statute assured to another. Though the railroad condemned the land for its embankment, it did so subject to the rights which were assured to the relator by the statute, and there rests upon it the obligation to preserve them, irrespective of the condemnation. Jones v. Seligman, 81 N. Y. 190, 197. The duty imposed upon the corporation is a continuous one. Hatch v. Railroad Co., 50 Hun, 64, 4 N. Y. Supp. 509; Town of Windsor v. President of D. & H. Canal Co., 92 Hun, 127, 36 N. Y. Supp. 863, affirmed on opinion in 155 N. Y. 645, 49 N. E. 1105. The alleged danger to the traveling public affords no excuse for a disregard of this statute. If engineering cannot surmount the danger, there remains either condemnation, or certainly purchase, to obviate it.

The learned counsel for the appellant also insists that mandamus cannot issue in this case. Mandamus lies against such a corporation. People v. Rochester & S. L. R. Co., 76 N. Y. 294; People v. Northern Central R. Co., 164 N. Y. 289, 58 N. E. 138. But the point raised is that the act commanded to be done is not for the benefit of the public, but for the owner of the lands. Certain authorities are cited, arguendo, that, where a mandamus has issued in cases apparently similar, the act commanded involved the public interest. Thus, it is said in People v. Dutchess & C. R. R. Co., 58 N. Y. 152, that, where a restoration of a highway was ordered, it was a public highway; in People v. Boston & A. R. Co., 70 N. Y. 569, that the bridge was designed to carry a public highway; in People v. Rochester & S. L. R. Co., supra, that the construction of fences and cattle guards was required from Rochester to Lefroy; and in People v. Northern Central R. Co., supra, that the highway was a public highway. These authorities undoubtedly involved matters of construction, repair, or improvement, which concerned the public, and yet that fact does not warrant the conclusion that such cases are authorities for the proposition that the writ of mandamus must be confined to them and to kindred cases. An example will illustrate: The Rome, Watertown & Ogdensburgh Railroad Com-

pany became, through consolidation, the owner of two lines of railroad between the same points, and abandoned one of them on the ground that parallel lines were unnecessary. The people, by their attorney general, prayed for a peremptory writ of mandamus to compel restoration. Earl, J., speaking for the court, said:

"As this writ was applied for by the attorney general on behalf of the people, it must be assumed that it was issued only to subserve a public interest and to protect a public right. If private interests only were involved, the application for the writ by the attorney general on behalf of the people was not proper. In that case it should have been applied for by the private parties interested, who should have been relators. In order, therefore, to maintain this writ, and to justify the action of the court in granting it, we must be able to see, from the undisputed facts alleged, that it was issued to protect some public right or to secure some public interest." People v. Rome, W. & O. R. Co., 103 N. Y. 104, 8 N. E. 369.

I think that the order in this case can be sustained upon the principle that there is a plain statutory duty cast upon this corporation, and that the right of the relator to the relief incident to its discharge is clear. In People v. Trustees St. Patrick's Cathedral, 21 Hun, 184, Barrett, J., at page 195, states the rule in terse language:

"Mandamus is appropriate where a public duty is imposed, or some act specifically directed, by statute."

Mr. Wood, in his work on Mandamus, at page 64, states:

"When a corporation fails to discharge its duties according to the requirements of its charter or the statutes of the state, it may be compelled to do so by mandamus, on the relation of any person having a special interest therein,"—and follows his rule with many instances.

See, also, Tapp. Mand. pp. *30, *31; Merrill, Mand. § 158 et seq.; 1 Redf. R. R. (6th Ed.) § 155; High, Extr. Rem. (3d Ed.) §§ 320, 326; Reg. v. Trustees, 1 Q. B. 860; Reg. v. York & N. M. R. Co., 3 Eng. R. R. Cas. 764, which latter case, though reversed in Railway Co. v. Milner, Id. 773, 776, did not disturb the rule laid down by Lord Denman, C. J.,—that a mandamus would issue. Lefurgy v. New York & N. R. Co. (Sup.) 3 N. Y. Supp. 302.

The learned counsel further contends that there is an adequate remedy by action. Undoubtedly there is another remedy, but that which is in law is not adequate, and that which is adequate is in equity. There is no adequate specific legal remedy which bars the relator.

The order appealed from must be affirmed, with $10 costs and disbursements. All concur.